IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| Thomas VENUTO, | |
| Plaintiff, | Civil No. 17-3363 (RBK/KMW) |
| v. | **OPINION** |
| ATLANTIS MOTOR GROUP, LLC, | |
| Defendant. | |

This matter comes before the Court on Defendant Atlantic Motor Group, LLC's Motion to Dismiss. (ECF No. 18.) Defendant argues that this Court lacks personal jurisdiction and that this case must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(2). Also before the Court is Plaintiff's Cross Motion to Compel Discovery and Adjourn Defendant's Motion to Dismiss. (ECF No. 20.)

As the Court finds that Plaintiff has met his burden of showing Defendant has sufficient minimum contacts with the State of New Jersey, Defendant's motion is **DENIED**. Plaintiff's Cross Motion is likewise **DENIED AS MOOT**.

I.  BACKGROUND

In June of 2016, Plaintiff Thomas Venuto, a car enthusiast residing in New Jersey, bid on an allocation for a new 2017 Ford Mustang Shelby GT 350Rs (the "Mustang") in an eBay auction held by Defendant Atlantis Motor Group ("AMG"), a limited liability company based out of Florida. (Venuto Cert., ECF No. 19-1 at ¶ 4.) Plaintiff was the highest bidder in this eBay auction, and, having won, was obligated to pay $23,900 for the right to buy the Mustang. (*Id.* at ¶ 6.) Ken

Gold, the owner of Atlantis Motor Group, contacted Plaintiff via email asking him to contact him about payment details, forgoing eBay's separate "Pay Now" option. (*Id.* at ¶ 7.)

On June 23, 2016, Plaintiff called Gold as requested in the email, and they exchanged pleasantries about their shared interest in car collecting. (*Id.* at ¶ 8.) Plaintiff noted that he had once owned a Backdraft Cobra; Gold told him that he had one in stock and that he could send pictures to Plaintiff if he was interested in purchasing it. (*Id.*) During that same phone call, Plaintiff told Gold that he had already purchased another black 2017 Mustang Shelby GT 350Rs from a Ford dealership in Texas and was in the process of completing the deal. (*Id.* at ¶ 9.) Plaintiff noted that because he had won the eBay bid, he would likely sell one of these two Mustangs. (*Id.*) Apparently sensing a business opportunity, Gold responded that AMG sells consignment vehicles for customers. (*Id.*) AMG was willing to sell the black Mustang and, Gold noted, had a trucking transportation company which could move the car from Texas and bring it to its dealership in Florida for consignment. (*Id.*) Gold stated he would email a contract for consignment to Plaintiff and that Plaintiff should let him know as soon as possible about his preferences because AMG had a truck in Texas at the time that could pick up the vehicle. (*Id.*)

During that same phone call, Plaintiff and Gold also discussed the winning bid for the Mustang allocation. (*Id.* at ¶ 11.) Gold stated he could provide vehicle transportation to Plaintiff's house for the Mustang, and could offer a transportation discount if Plaintiff agreed to consign the other car in Texas. (*Id.* at ¶ 10.) The two men also reviewed the specifications for the Mustang, and Gold explained that he was part of a racing team and had bought the allocation for the car for that purpose. (*Id.* at ¶ 11.) Gold stated he would call the Ford dealership to switch the allocation into Plaintiff's name, as Gold had already paid a $10,000 deposit to the dealer for the allocation. (*Id.* at ¶ 12.) Gold also requested that Plaintiff wire him directly instead of going through the usual

eBay payment method. (*Id.*) Plaintiff told Gold he did not mind that method, provided he had something in writing to confirm that AMG was a legitimate business. (*Id.*) Gold responded that he would follow up with another email. (*Id.*)

After the phone conversation, Gold sent Plaintiff an email asking him to review the attached documents and to advise when Plaintiff would wire $14,900 to the AMG account. (*Id.*) The email included three attachments: one described what he was doing with the numbers for the allocation; the other indicated he would be able to change the name of the allocation owner; and the third was the wire transfer information. (*Id.* at ¶ 13.) Gold again requested that Plaintiff call him so he could help sell the black Mustang from the Texas dealership. (*Id.*) That same afternoon, Plaintiff also received another email from Gold, containing a blank consignment contract for his review. (*Id.*)

The next day, on Friday, June 24, 2016, Gold texted Plaintiff, asking him to call, and texted a few hours later requesting payment status. (*Id.* at ¶ 16.) Plaintiff transferred $14,900 from his bank account in New Jersey to Gold. (*Id.*) He texted a picture of the receipt to Gold, who replied "received, thank you. I'll send the dealer info shortly." (*Id.*) That evening, Plaintiff received an email from Gold providing the name of the dealership that would be selling the allocation Mustang he had purchased on eBay. (*Id.* at ¶ 17.) That same email also requested information on the potential consignment vehicle in Texas so that Gold could arrange transportation. (*Id.*) Gold also sent Plaintiff another email concerning the Backdraft Cobra they had discussed. (*Id.* at ¶ 18.)

Gold followed up the next morning with a text to check whether Plaintiff had received his emails. (*Id.* at ¶ 19.) Plaintiff responded that he had, but that he preferred a different make for the Backdraft Cobra, and it appears this transaction fell through. (*Id.*) But the two men still discussed the potential consignment. Gold texted "please send me the pickup info on your black GT"—i.e.,

3

the black Mustang in Texas—so he could arrange transportation. (*Id.*) Plaintiff stated that he would do so. (*Id.*) Some time later that day, Gold texted that he had a truck in Houston, Texas which could move the vehicle, and Plaintiff replied that he could move the car Thursday. (*Id.*) Similar texts occurred the next day. (*Id.* at ¶ 21.)

Plaintiff ultimately decided to cancel the consignment agreement concerning the black Mustang in Texas, as he had been having trouble with the Texas dealership. (*Id.* at ¶ 23.) But Plaintiff and Gold continued to interact over the Mustang purchased over eBay. (*Id.* at ¶ 24.) However, Plaintiff maintains the car was not built to his specifications, and in an email he requested a refund because the Mustang was promised by Fall of 2016. (*Id.*) It was apparent, as Plaintiff tells it, that it would not be delivered by then. (*Id.*) AMG, for its part, maintains that it has never sent any mail or deliveries to New Jersey in connection with this proposed transaction, never sent an agent to New Jersey, and only interacted with New Jersey over the phone and follow up calls, a stance not supported by the record. (Gold Cert., ECF No. 18-2 at ¶ 19.)

Defendant has moved to dismiss this matter for lack of personal jurisdiction. After a brief stay in proceedings to conduct limited discovery on the issue, the matter is now ripe for review.

**II.     DISCUSSION**

When a defendant raises a personal jurisdictional objection, the plaintiff bears the burden of showing that jurisdiction is proper. *Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992). A plaintiff meets this burden by presenting a prima facie case for the exercise of personal jurisdiction, which requires that he or she establish "with reasonable particularity sufficient contacts between the defendant and the forum state." *Id.* (citing *Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n*, 819 F.2d 434 (3d Cir. 1987)). It is insufficient to rely on the pleadings alone; rather, a plaintiff must establish facts relevant to personal

4

jurisdiction by affidavits or other competent evidence. *Patterson v. Fed. Bureau of Investigation*, 893 F.2d 595, 603-04 (3d Cir.1990) (citing *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 67 n.9 (3d Cir. 1984)).

To exercise personal jurisdiction over a defendant, a federal court sitting in diversity must undertake a two-step inquiry. *IMO Indus., Inc. v. Kiekert, AG*, 155 F.3d 254, 259 (3d Cir. 1998). First, the court must apply the relevant state long-arm statute to see if it permits the exercise of personal jurisdiction. *Id.*; *see Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007) (quoting Fed. R. Civ. P. 4(k)) ("[A] federal district court may assert personal jurisdiction over a nonresident of the state in which the court sits to the extent authorized by the law of that state."). Second, the court must apply the principles of due process. *IMO Indus., Inc.*, 155 F.3d at 259. In New Jersey, this inquiry is combined into a single step because the New Jersey long-arm statute permits the exercise of personal jurisdiction to the fullest extent permissible under the Due Process Clause. *Id.*; *see Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 145 (3d Cir. 1992) (citing N.J. Court R. 4:4-4(c)) ("The New Jersey long-arm rule extends to the limits of the Fourteenth Amendment Due Process protection.").

Due process permits the exercise of personal jurisdiction over a nonresident defendant where the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Provident Nat'l Bank*, 819 F.2d at 437 (internal citations and quotations omitted). A plaintiff may establish jurisdiction by proving the existence of either specific or general jurisdiction. *Id.* To establish specific jurisdiction, a plaintiff must demonstrate that "the particular cause of action sued upon arose from the defendant's activities within the forum state." *Id.* On the other hand, to establish general jurisdiction, the plaintiff must "show significantly more than mere minimum contacts";

5

the defendant's forum contacts must be "continuous and substantial." *Id.* (citing *Gehling v. St. George's Sch. of Med., Ltd.*, 773 F.2d 539, 541 (3d Cir. 1985); *Compagnie des Bauxites de Guinea v. Ins. Co. of N. Am.*, 651 F.2d 877 (3d Cir. 1981)).

Specific jurisdiction is established when a nonresident defendant has "purposefully directed" his activities at a resident of the forum and the injury arises from, or is related to, those activities. *See Burger King Corp. v. Rudzewiczi*, 471 U.S. 462, 472 (1985). To comport with the requirements of Due Process, a plaintiff must show that (1) the nonresident defendant has "certain minimum contacts with [the forum state]" and that (2) "the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). The minimum contacts requirement is satisfied so long as the contacts resulted from the defendant's purposeful conduct and not the unilateral activities of the plaintiff. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297-98 (1980). Put differently, there must be some act or acts by which a defendant "purposefully avails itself of the privilege of conducting activities within the forum State, *Hanson v. Denckla*, 357 U.S. 235, 253 (1958), such that the defendant should "reasonably anticipate being haled into court" there. *World-Wide Volkswagen Corp.*, 444 U.S. at 297.

The parties make much of the use of eBay and other relatively recent developments in commercial transactions, but this is not a complicated case about a plaintiff interacting with a website and filing a lawsuit, an issue that can occasion some confusion when the defendant truly has not reciprocated plaintiff's solicitations. *See, e.g.*, *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997). Rather, this is a case about a plaintiff interacting with a website and *then* entering protracted business negotiations with a defendant. Whatever doubts may have arisen about personal jurisdiction as to the use of eBay are dispelled by AMG's subsequent

interactions with Plaintiff.[1] The record is replete with instances of AMG, through its owner-operator, Ken Gold, soliciting business and attempting to close a deal with Plaintiff, a New Jersey citizen. AMG "purposefully directed" some activities—e.g., negotiations carried in electronic media—at the forum state, and the alleged breach of contract relates to those activities. *See Burger King Corp.*, 471 U.S. at 472; *see also Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) (noting that for a forum state to exercise specific jurisdiction over a defendant, the case must "arise out of or relate" to the defendant's activities within the state). That Ken Gold used email, telephone, and texts to solicit business instead of letters or other more concrete forms of communication does not impact the functional effects of AMG's attempt to close a deal. By all appearances this transaction was a "digital handshake," with two people reaching out from New Jersey and Florida. AMG purposefully availed itself of the forum when it decided to engage in business with a New Jersey citizen and it was on notice that it could be haled into court in New Jersey, if only because the prospect of litigation attaches, even if only remotely, to any such deal. The Court finds AMG had minimum contacts with the State of New Jersey and may therefore exercise personal jurisdiction over AMG.

### III.	CONCLUSION

For the reasons stated above, Defendant's motion is **DENIED**. Plaintiff's Cross Motion is similarly **DENIED AS MOOT**. An order follows.

Dated:  May 8, 2018                                                                  /s Robert B. Kugler
                                                                                                    ROBERT B. KUGLER
                                                                                                    United States District Judge

---

[1] The Court agrees, however, that the mere use of eBay does not "dig[] a virtual moat around the defendant, fending off jurisdiction in all cases." *Boschetto v. Hansing*, 539 F.3d 1011, 1019 (9th Cir. 2008).